SUBURBAN HOSPITAL ASSOCIATION, INC. ET AL.
v. JOSEPH HADARY ET UX.

[No. 919, September Term, 1973.]

*Decided July 19, 1974.*

The cause was argued before MORTON, MENCHINE and LOWE, JJ.

*William N. Zifchak,* with whom were *William N. Rogers* and *Carr, Bonner, O'Connell, Kaplan & Thompson* on the

brief, for appellant Suburban Hospital Association, Inc. *Thomas J. Scanlon* for other appellant.

*James D. Newton* for appellees.

MENCHINE, J., delivered the opinion of the Court.

Norma T. Hadary (Patient) sued Suburban Hospital Association, Inc. (Hospital) and Sidney J. Malawer, M.D. (Doctor) for damages for personal injuries allegedly resulting from negligent hospital and medical treatment. Norma T. Hadary and her husband jointly sued the Hospital and the Doctor for loss of consortium alleged to have been produced by such injuries. The case was tried before a jury in the Circuit Court for Montgomery County, Joseph M. Mathias, J., presiding.

The jury returned a verdict in favor of Norma T. Hadary for $15,000, and a joint verdict in favor of Joseph Hadary and Norma T. Hadary for $1,000 against both Hospital and Doctor. From the judgments thereafter entered both Hospital and Doctor have appealed. Both contend that the evidence was legally insufficient to show negligence. Doctor also suggests error in the court's instruction and errors in the exclusion of evidence.

## Sufficiency of the Evidence

Norma T. Hadary had suffered from psoriasis from about 1964 or 1966. She said that the disease evidenced itself by spots over the trunk or torso, on the thighs and in her scalp, inside her ears, in the corner of the nose, on her elbows. She said her toenails thickened and became deformed and distorted. She said her skin was rough and scaly. When treatment by other doctors failed to produce improvement, she consulted a firm of dermatologists. On November 15, 1967, under their care, a course of methotrexate therapy was commenced. The methotrexate therapy was effective in controlling the psoriasis to the point that her dermatologist said represented 75 to 80% improvement. He said also that from an aesthetic point of view, her appearance also had

improved considerably at the time of the occurrence complained of.

Methotrexate therapy for psoriasis was described as posing a potential hazard to a patient's liver. Accordingly, to rule out liver damage from the therapy, her dermatologist on May 12, 1970 referred Patient to Dr. Sidney J. Malawer, one of the appellants, for a liver biopsy. Mrs. Hadary entered Suburban Hospital on Dr. Malawer's service on June 4, 1970 and on the morning of June 5, 1970 a liver biopsy was performed by Doctor in Patient's hospital room. The Doctor was assisted by a nurse whose identity was not disclosed at trial.

The biopsy required insertion of a menghini needle into the liver. A syringe attached to the needle withdrew liver tissue into the bulb of the needle for laboratory analysis. That analysis showed the liver to be entirely normal. Patient remained in the hospital until her discharge at 11:30 a.m. on June 6, 1970. On that afternoon Doctor telephoned, advising Patient that a nurse had told him that the needle used at biopsy may not have been sterile. Doctor explained that because the needle may have been used on another person suffering from a liver disease, Patient may have been exposed to a risk of infectious hepatitis.

Patient then was required to undergo a series of massive gamma globulin injections. These injections, continuing from June through November, 1970, were described as extremely painful. It was necessary also to suspend methotrexate therapy for her psoriasis during the course of the gamma globulin injections because continuance of that therapy would confuse the required tests incident to the anti-hepatitis procedures. In consequence, Patient's psoriasis worsened, becoming more severe and more widely spread than it had ever been. It was not until December 11, 1970 that it was possible for methotrexate therapy to be resumed and another year before the level of improvement she had reached on June 5, 1970 again had been achieved.

Patient's dermatologist testified (without evidence to the contrary) that discontinuance of methotrexate therapy was essential to the use of gamma globulin injections and that

such discontinuance caused the worsening of Patient's psoriasis.

It was also uncontradicted that gamma globulin injections were required solely because of doubt concerning sterility of the menghini needle. It was conceded that a sterile needle should be used in making a liver biopsy.

In short, the causal connection of the biopsy operation; the concomitant necessity for gamma globulin injections; and the cessation of methotrexate therapy to the Patient's worsened psoriasis was clearly shown by the evidence. Both Hospital and Doctor, however, contend that it was not shown that either was negligent. Both contend that there has been no showing that there had been a breach of the community standard of care by either. Each urges that expert testimony to such effect was a requisite to recovery and that in its absence the case should have been withdrawn from the jury as to both appellants.

An annotation in 81 A.L.R.2d at page 601 declares that:

> "The overwhelming weight of authority supports the view that ordinarily expert evidence is essential to support an action for malpractice against a physician or surgeon."

In the same annotation it is stated at page 608:

> "In cases in which a physician's or surgeon's want of skill or lack of care has been such as to be within the comprehension of laymen and to require only common knowledge and experience to understand and judge it, it has been held that expert evidence was not required to make out a case against the physician or surgeon for malpractice."

A similar general rule and exception as to claims asserted against hospitals is declared in an annotation in 40 A.L.R.3d:

(Page 520) (The rule)

> "Numerous cases have taken the position that expert evidence is ordinarily necessary to support an action against a hospital for injury or death of a

patient, at least where the particular acts, omissions, or other circumstances required to be shown involve technical or complex matters of opinion."

(Page 523) (The exception)

"Numerous cases have taken the position that where a hospital's negligence was such as to be within the comprehension of laymen and to require only common knowledge and experience to understand and judge it, expert evidence is not required to make out a case against a hospital for the injury or death of a patient resulting from such negligence."

It is quite plain that Maryland recognizes both the rule and the exception. In *Thomas v. Corso*, 265 Md. 84, 288 A. 2d 379, the Court of Appeals discussed the subject in some depth, saying at pages 97, et seq. [387, 388]:

"Although in many medical malpractice cases expert testimony is required to be introduced by the plaintiff to establish the standard of care in the locality involved, see *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 258 A. 2d 595 (1969), involving an intricate open heart operation and a broken fragment of needle left in the patient's chest, it is well recognized by the Maryland cases that there may be cases in which no expert testimony is required to establish the standard of care or its breach by the physician. We discussed the law in this regard in *Central Cab Co. v. Clarke*, 259 Md. 542, 551-52, 270 A. 2d 662, 667-68 (1970). We stated:

'The situation in the instant case [involving the malpractice of an attorney in failing to notify his client of his termination of employment whereby a default judgment was obtained against the client] is analogous to cases involving medical malpractice in which a dentist pulled the wrong tooth, and our

predecessors held in affirming a judgment for the plaintiff that there was no necessity for expert testimony to establish that a dentist should not pull the wrong tooth. *McClees v. Cohen,* 158 Md. 60, 148 A. 124 (1930). The same rule applies in cases in which physicians have done an obviously negligent act such as accidentally amputating the wrong arm, or negligently leaving a sponge in a patient's body. *Rural Educational Ass'n v. Bush,* 42 Tenn. App. 34, 298 S.W.2d 761 (1956) and *Frederickson v. Maw,* 119 Utah 385, 227 P. 2d 772 (1951).

'In *Butts v. Watts,* 290 S.W.2d 777, 779 (Ky. 1956), it was stated: "There is a limitation on the rule that expert testimony is essential to support a cause of action for malpractice where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts."

'See also *Johns Hopkins Hospital v. Genda,* 255 Md. 616, 258 A. 2d 595 (1969) holding that expert testimony was necessary in that medical malpractice case involving a complicated operative technique in regard to heart surgery, but contrasting that case with medical malpractice cases of carelessly dropping a scalpel or knife on a patient causing him to be cut or dropping acid carelessly on a patient causing him to be burned.'

\* \* \*

"See also *Fink v. Steele,* 166 Md. 354, 361, 171 A. 49, 52 (1934); 81 A.L.R.2d 597, 'Necessity of expert evidence to support an action for malpractice against a physician or surgeon.' "

The negligence charged to Hospital and Doctor is not, of course, precisely parallel. We believe, however, that a single recitation of the evidence, viewed, as we must view it, most

favorable to appellees' right to recover (*Schweitzer v. Showell*, 19 Md. App. 537, 539, 313 A. 2d 97, 99) will suffice for our discussion of the issue as to both.

Dr. Malawer, a specialist in internal medicine and gastroenterology, possessed operative privileges at the Suburban Hospital in Bethesda, Maryland. He performed a substantial number of liver biopsies at that hospital and had been authorized to keep two menghini needles in the Minor Surgery Department of the Hospital. Sterilization of the menghini needles after use was undertaken by the Hospital. This was commenced by the washing and soaking of the used needle in Zephiran and its subsequent placement within a sealed test tube. The item to be sterilized then was wrapped and secured with a special tape of a cream color. The package, as thus wrapped and taped, thereafter would be taken from the Minor Surgery Department to Central Supply for sterilization by a device known as an "Autoclave." That device subjected the item to procedures that assured elimination of germs, bacteria or other contaminants. In the course of sterilization in the autoclave, the special cream colored tape that was used to seal the package containing the item underwent a change to a wholly different appearance. Black diagonal lines, measuring a couple of millimeters in diameter became visible upon the tape. Those markings upon the tape gave assurance of the sterility of the contents of the package. The package was marked with the Doctor's name and dated 14 days ahead, the period the item would remain sterile.

Mrs. Little testified that the particular unsterilized menghini needle used in the subject biopsy had been placed on the second shelf from the top in a cabinet in the minor surgery room. At the time of the subject incident it had been the practice to use the upper two shelves of that cabinet for storage of non-sterile items and to use the lower shelves of the same cabinet for sterile items.

Doctor testified: "It was my understanding at that time that sterile supplies were kept in the entire cabinet, although I always found my needles down — I have to bend down to find my needles." At the time of trial the entire cabinet was used for sterile items only.

On the morning of June 5, 1970 Dr. Malawer came into the minor surgery department. At that time an unnamed doctor and the minor surgery nurse of the day, Mrs. Mina Little, were engaged in minor surgery. Mrs. Little testified the Doctor said, "I want my needle" and that she replied "Just a minute, I will get them for you." He said, "No, no, I will get them, and I said — I repeated it * * * I didn't see what he did. He walked out quickly." She added that she had always handed the menghini needles to Doctor and that it was not the practice to let a doctor come in and help himself to the supplies.

Later, Dr. Malawer came back to the minor surgery room and handed her the menghini needle used in the subject biopsy. She put it in to soak and went ahead with her work. At the end of the day she "thought I will take that other needle I wrapped up this morning and I reached up on the shelf and the needle was not there. I thought what in the world happened. He was going to get his needle and it's not there. I looked down on the shelf, second shelf from the bottom where we kept his needles before and there was his sterile needle." Dr. Malawer was informed by telephone. Nurse Little did not report the incident to Hospital authorities until about three weeks later, explaining that Doctor Malawer had requested that she say nothing about it.

As heretofore stated, at the time of the subject incident the cabinet in the minor surgery room was used for the storage of sterile and non-sterile items, without separation except that provided by the shelving upon which items were placed. The shelves themselves contained no notation or designation as to whether the items on a particular shelf were sterile or not.

After Dr. Malawer had removed the package containing the subject needle from the cabinet, he put it in his pocket and carried it to the hospital room of Mrs. Hadary where the biopsy was performed. At that point he gave it to the unidentified nurse who assisted him. Dr. Malawer said that he believed that the needle was sterile, but admitted that he had responded by interrogatory that he had no specific recollection that he observed the wrapping of the needle at

the time he obtained it from minor surgery. He acknowledged that the color of the autoclave tape would enable one to know whether an instrument was sterile. He acknowledged that he made no effort to confer or consult with the unidentified nurse who had been his assistant during the Hadary biopsy when informed by Nurse Little that he had taken a nonsterile rather than a sterile needle from the cabinet in the minor surgery room.

The standards and regulations of the Maryland State Department of Health for the government of hospitals within the State included the following:

> 0405 Sterile Supply and equipment shall be stored in a suitable enclosed space, providing separation from unsterile supplies.

Hospital contends that the regulation provides "no guidance to the layman which would allow him to determine * * * whether * * * a given separation of sterile from unsterile supplies was suitable." We disagree.

From the time of the research done by Sir Joseph Lister, it has been a matter of general personal knowledge that sterilization of instruments is a *sine qua non* to surgery. This is not a case of alleged negligence in diagnosis or in the choice of a method of treatment. Here, the issue of negligence is not related to technical matters peculiarly within the knowledge of medical practitioners, but to circumstances where the exercise of the common knowledge and experience of reasonable men would be expected to make an assessment and evaluation of the conduct of professionals, without the necessity for the assistance of expert witnesses.

It is true that Doctor disclaimed use of a non-sterile needle. Nonetheless, he elected to follow a course inconsistent with that disclaimer. The jury had the right to accept the testimony of Nurse Little that directly or by reasonable inference showed that a non-sterile needle was in fact used by Doctor in the biopsy and to conclude that its use was inconsistent with his obligation to exercise due care.

The suggestion of Doctor and Hospital that expert

testimony is essential before the trier of fact may pass judgment upon their conduct in the storage, selection and use of the menghini needle is akin to a suggestion that such testimony would be required before a trier of facts might distinguish between a zebra and a horse or a garter snake and an asp, when the issue for decision was their appearance or their relative danger, rather than whether their respective species evolved from common ancestors.

The evidence plainly was sufficient also to permit the jury to conclude that Hospital had not provided suitable separation of sterile and non-sterile items.

We hold that the facts and circumstances shown by this record bring the subject case within the exception to the general rule. Expert testimony was not an essential element of required proof. Determination of the negligence *vel non* of Hospital and Doctor properly was submitted to the jury for decision.

### The Court's Charge

Doctor's appellate suggestion of a deficiency in the charge respecting the duty owed by him comes too late. No such objection was made below. It is not before us. Maryland Rule 554 e.

### Exclusion of Evidence

Doctor contends that the trial judge erroneously excluded:

- (a) a hospital record indicating x-ray evidence of osteoarthritis of the spine and
- (b) an opinion of Patient, expressed in the course of a deposition before trial, that "she didn't consider him at fault at all."

We see no error.

There was no evidence of any back complaint by Patient. The trial court correctly ruled that introduction of the hospital record pertaining to the spine was wholly immaterial.

The exclusion of the opinion was proper. *Franceschina v. Hope,* 267 Md. 632, 298 A. 2d 400 (1973).

*Judgments affirmed.*
*Costs to be paid by appellants.*