# WILLIAM HAHN ᴇᴛ ᴀʟ. *v.* SUBURBAN HOSPITAL ASSOCIATION, INC.

[No. 948, September Term, 1982.]

*Decided May 17, 1983.*

The cause was argued before MASON, BISHOP and ALPERT, JJ.

*George W. Shadoan,* with whom was *Richard S. Paulson* on the brief, for appellants.

*David L. Terzian,* with whom were *David E. Manoogian* and *Beckett, Cromwell & Myers, P.A.* on the brief, for appellee.

ALPERT, J., delivered the opinion of the Court.

In this case of alleged medical malpractice, we are called upon for the first time to determine the sufficiency of evidence necessary to rebut the statutory presumption of correctness of an arbitration award issued by a Health Claims Arbitration Panel. Such an award was issued in the instant case in favor of the widower, [1] children and estate of Gloria Hahn (appellants) against Suburan Hospital Association, Inc. (appellee) for a medical malpractice claim. In the Circuit Court for Montgomery County the trial judge overruled appellants' motion for a directed verdict and determined there was sufficient evidence to generate a question of fact for the jury to resolve as to the negligence of the appellee. The jury, in returning a verdict in favor of appellee, obviously was convinced that the statutory presumption had been rebutted, and that Suburban Hospital was not negligent. We conclude that on the evidence presented, reasonable minds might have differed as to whether Suburban

---

[1]. On March 18, 1982, during the course of the trial before the Circuit Court, the individual claim of William Hahn, widower of Gloria Hahn, was withdrawn.

Hospital complied with the appropriate standard of care and shall therefore affirm.

I. *Factual Background*

At 1:31 p.m. on March 21, 1977 Gloria Hahn was pronounced dead in the emergency room of Suburban Hospital in Bethesda, Maryland. Approximately 15 hours earlier, on March 20th, she had been taken by her brother to the emergency room of that hospital complaining of chest pain under her left breast which had been bothering her for about a week. She was examined by Dr. John Scott who was under contract with Suburban to provide medical services to emergency room patients. As part of the examination, he interviewed the patient and although not a cardiologist, caused an electrocardiogram (EKG) to be taken. He subsequently read the EKG tracing himself. Based upon his examination of Mrs. Hahn and his interpretation of the EKG, Dr. Scott told Mrs. Hahn "I don't think there is anything here that is life-threatening and if you will promise me to see Dr. Cohn [her family physician] as soon as possible, I'll let you go home." He testified "I gave her a sedative, 10 milligrams of valium, and she went home."

The EKG tracing was first seen by a cardiologist, Dr. Frederick Caldwell, at about 3:00 P.M., 90 minutes *after* Mrs. Hahn was pronounced dead. Dr. Caldwell, who was one of several physicians under contract with Suburban to read EKG tracings, read the tracing to suggest "active ischemic process," which indicated the possibility of a myocardial infarction occurring at the time the EKG was being administered. Having observed from the hospital record that Mrs. Hahn had been sent home, he proceeded to notify the emergency room physician of the possibility that she needed further care, in order that she could be recalled to the hospital. Unfortunately, she was already dead.

II. *The Procedural Background*

On or about May 15, 1980, as a result of claims filed

because of Mrs. Hahn's death, a Health Claims Arbitration Panel issued the following "award":

### HEALTH CLAIMS ARBITRATION AWARD

#### I. LIABILITY

1. Defendant Suburban Hospital is liable to Claimants for compensatory damages.

2. Defendant Suburban Hospital Association (is) _____ (is not) X liable to Claimants for punitive damages.

3. Defendant Scott (is) _____ (is not) X liable to Claimants for compensatory damages.

4. Defendant Scott (is) _____ (is not) X liable to Suburban Hospital on Suburban Hospital's Crossclaim against Doctor Scott.

#### II. DAMAGES

The Panel awards damages to the Claimants as follows:

| | Total Comp. Damages | Comp. Damages Scott | Comp. Damages Suburban | Punitive Damages Suburban |
|---|---|---|---|---|
| William Hahn | $3,000.00 | 0 | All | 0 |
| Norman Eugene Hines | 1,000.00 | 0 | " | 0 |
| Lisa Marie Hines | 2,000.00 | 0 | " | 0 |
| Deena Marie Hahn | 5,000.00 | 0 | " | 0 |
| Dawn Mary Hahn | 5,000.00 | 0 | " | 0 |
| Patricia Hahn | 5,000.00 | 0 | " | 0 |
| Tracy Colleen Hahn | 5,000.00 | 0 | " | 0 |

Pursuant to Cts. & Jud. Proc. Code Ann. §3-2A-06, all of the plaintiffs and Suburban rejected the findings of the Arbitration Panel.

On August 13, 1980, the Plaintiffs (William Hahn, individually and as personal representative of the estate of Gloria Hahn, deceased, and Dennis M. Ettlin, guardian ad

litem for Deena Marie Hahn, Dawn Mary Hahn, Patricia Hahn, Tracy Colleen Hahn, Norman Eugene Hines and Lisa Marie Hines) filed suit against Suburban Hospital Association, Inc. and John E. Scott, M.D. seeking "to nullify the award of the arbitrators in HCA No. 78-84, filed on May 15, 1980. . ." and alleging, *inter alia:*

> [T]hat the Defendant Scott was negligent, deviated from the standard of care and was guilty of medical negligence in his care and treatment of Gloria Hahn on March 20, 1977, specifically including but not limited to the following: *Failure to correctly diagnose Gloria Hahn's medical illness on March 20, 1977; failure to properly and correctly read and interpret Gloria Hahn's electrocardiogram tracing on March 20, 1977; failure to consult with a physician competent to correctly read and interpret Gloria Hahn's electrocardiogram tracing on March 20, 1977;* failure to contact Gloria Hahn's family physician on March 20, 1977, as required by the rules and regulations of the hospital; *failure to properly treat the medical illness of Gloria Hahn; failure to adequately monitor Gloria Hahn in the emergency room or to recommend admission to the hospital for purposes of monitoring and treatment;* that the Defendant Suburban Hospital Association, Inc., represented to Gloria Hahn that the Defendant Scott and the staff of the emergency room at Suburban Hospital were its agents and employees, and the Defendant Suburban Hospital is liable to Plaintiffs for all acts of negligence of the Defendant Scott under the doctrine of *respondeat superior;* that the Defendant Suburban Hospital Association, Inc. was independently negligent, deviated from the standard of care and was guilty of medical negligence in its care and treatment of Gloria Hahn, specifically including but not limited to the following: Failure to provide an emergency room physician qualified and competent to correctly read

and interpret electrocardiogram tracings of emergency room cardiac patients; failure to provide adequate equipment and facilities to correctly read and interpret electrocardiogram tracings of emergency room cardiac patients; failure to provide for timely review by qualified physicians of electrocardiograms taken in the emergency room; failure to monitor compliance with hospital and emergency room rules and regulations by emergency room staff and physicians.

The Plaintiffs also alleged:

[T]hat on March 21, 1977, Plaintiffs' decedent Gloria Hahn suffered a myocardial infarction at her home; that the Montgomery County Rescue Squad mobile intensive care unit was summoned and responded; that upon their arrival the paramedics instituted appropriate medical care including defibrillation of Gloria Hahn's heart 'and began to transport her to the emergency room at Suburban Hospital; that en route to Suburban Hospital it was necessary for the paramedics to contact the emergency room physicians at Suburban Hospital in order to receive authority to again defibrillate Gloria Hahn's heart in order to preserve her life; that the paramedics were unable to contact the emergency room at the hospital because personnel of the emergency room had intentionally and deliberately turned off the radio communications between the mobile intensive care unit and the emergency room; that because the paramedics were unable to contact the emergency room physician they were not authorized to again defibrillate Gloria Hahn's heart and she was pronounced dead at the hospital; that the Defendant Suburban Hospital Association, Inc. is guilty of gross, wanton and reckless disregard of its duty to Gloria Hahn and its obligations to her under the standard of care by reason of the intentional act of its servant and

employee in the emergency room in turning off the communications radio; that prior to March 21, 1977, the Defendant Suburban Hospital Association, Inc. knew that hospital personnel in the emergency room had on other prior occasions turned off the communications radio and that paramedic units en route to the hospital with emergency patients had been unable to contact the hospital; that despite this prior knowledge the Defendant Suburban Hospital Association, Inc. negligently failed to take any action to insure that the communications between the hospital and the paramedics would be maintained; that the failure of the Defendant Suburban Hospital Association, Inc. to correct the situation and to insure that the communications radio remained on was conscious and deliberate and undertaken with full knowledge and understanding of the danger posed to the lives of patients being transported to the hospital.

On March 15, 1982 the case came on for trial before Judge John J. Mitchell and a jury. At the close of the Plaintiff's case, the trial judge directed a verdict in favor of the defendant Dr. Scott, and denied Suburban's motion for directed verdict. At the close of the defendant's case the trial judge once again denied Suburban's motion for directed verdict. Plaintiff's motion for directed verdict at the end of the entire case was denied and the case was submitted to the jury for their deliberation. On March 30, 1982 at 3:05 P.M. the jury returned a verdict. Responding to the Court's question: "Do you find that the Defendant, Suburban Hospital Association, Incorporated is liable to the Plaintiffs for compensatory damages?" the foreman of the jury answered "No."

Plaintiffs moved for Judgment N.O.V. and for Partial New Trial. The Motion was denied and judgments were entered for the defendants.[2] This appeal followed and appellants raise the following questions:

---

2. In fact, however, the official docket entries utilize the word "judgment" in the singular and not "judgments" in the plural. We view this to be nothing more than a clerical error and not a violation of Maryland Rule 605 (a).

I. Did the Defendant present sufficient evidence to meet its burden to prove that the arbitration award was not correct?

II. Did the trial court err in failing to direct a verdict on the issue of liability in favor of plaintiffs against Suburban and in failing to grant plaintiffs' motion for judgment N.O.V. and partial new trial when plaintiffs' uncontradicted expert testimony established that the hospital failed to meet the applicable standard of care and that the hospital's failure was the proximate cause of decedent's death?

III. *The Issues*

A. The Statutory Presumption That the Arbitration Award is Presumed to be Correct

Appellant correctly observes that:

This case is the first occasion for this Court to consider the Maryland Health Care Malpractice Claims Statute, *Maryland Code* (1974, 1982 Cum. Supp.), Sections 3-2A-01 to 3-2A-09 of the Courts Article, particularly sub-section (d) of Section 3-2A-06, which provides:

(d) *Admissibility of award; presumption of correctness.* — Unless vacated by the court pursuant to subsection (c), the arbitration award is admissible as evidence in the judicial proceeding. The award shall be presumed to be correct, and the burden is on the party rejecting it to prove that it is not correct.[3]

We hold that since the Health Claims Arbitration Panel found Suburban Hospital liable to the appellants for compensatory damages, the burden of proof on the issue of negligence shifted at trial to Suburban by virtue of sub-section (d) above. Procedurally, the Maryland Workmen's Compensation Law is analogous. Md. Ann. Code

---

**3.** Maryland Rule BY5 provides that "[u]nless the arbitration award is vacated pursuant to Code, §3-2A-06 (c), Courts Article, it is admissible as evidence and the burden of proof is on the party rejecting the award to show that it is not correct."

art. 101, § 56 (c) provides in pertinent part ". . . the decision of the Commission shall be prima facie correct and the burden of proof shall be upon the party attacking the same."

Similar to a Workmen's Compensation appeal, sub-section (d) of §3-2A-06 places the burden of proof upon the party rejecting the award, whether he be plaintiff or defendant. It establishes no new rule when the plaintiff happens to be the party rejecting the award, as the burden was always upon the plaintiff to prove his case by a preponderance of the evidence. But the statute shifts the burden from the plaintiff to the defendant where the defendant, in effect, loses before the Health Claims Arbitration Panel and rejects the award, requiring the defendant in such a case (after filing an action to nullify the award) to satisfy a jury by a preponderance of evidence that the plaintiff is not entitled to the award made by the Panel. *See, Stewart & Co. v. Howell,* 136 Md. 423, 110 A. 899 (1920). Thus, in the instant case the burden was cast upon Suburban to overcome the presumption that the award of the Panel is correct and it must do this to the satisfaction of the trier of the facts. Under the circumstances, Suburban had to prove by a preponderance of the evidence that it was not negligent, that indeed, it did comply with the appropriate standards of care as discussed *infra.* By the same token, the plaintiffs were required to prove by a preponderance of the evidence that the damages awarded by the Panel were inadequate.

Where the facts making up negligence are conceded, undisputed or uncontroverted, and the inferences to be drawn therefrom are plain, definite and undisputed (which is not the case here, as the issue of compliance with appropriate standards of care was controverted), their legal significance is a matter of law to be determined by the court, but where the facts, or inferences therefrom, or both, are in dispute, such questions are to be determined by a jury and the jury is entitled to weigh and evaluate the evidence, and may disbelieve evidence, even though it is uncontradicted.

*See, Talley v. Department of Correction,* 230 Md. 22, 28, 185 A.2d 352 (1962).

B. *Sufficiency of the Evidence*

Plaintiffs contend that "Suburban Hospital had the burden of proving the arbitration award incorrect and it failed to meet that burden." They argue that although "[f]ive physicians associated with Suburban testified in this case. . . .

> None of these men testified as to the standard of care which Suburban was required to meet at the time Mrs. Hahn was treated . . . [and]

> None of them testified to whether or not Suburban's treatment of Mrs. Hahn measured up to the appropriate standard of care, whatever it was."

Initially, we note that there was testimony from a variety of witnesses from which the jury could have inferred that neither the attending physician nor hospital were negligent:

1. Dr. Frederick Caldwell, a cardiologist called by appellants, indicated among other things, that impressions formed by physicians in seeing a patient personally are at least as important if not more important than any piece of laboratory data, such as the EKG.

2. Dr. Stephen Jones, a cardiologist called by appellants, through introduction of his deposition, testified that there was a method whereby the emergency room physician could consult an EKG reader, as one or more of 13 contract readers would be in the Hospital at any given time.

3. Dr. Robert Montgomery, chairman of Suburban Hospital's contract cardiologists, indicated that EKG's are not precise for a multitude of reasons, that an EKG reader would not be in as good a position as the doctor who saw the patient face to face, that the statistical likelihood of a 33 year old female having a myocardial infarction is very small, that an EKG is only a small part of the clinical picture in diagnosing a heart attack, and that the second reading of Mrs. Hahn's EKG within 13 to 15 hours after its being taken was well within the standard of care required for Suburban Hospital.

4. Dr. John Scott, testifying in the Plaintiff's case, stated, *inter alia,* in substance that his original diagnosis was correct.

If believed, this evidence would be sufficient to prove the arbitration award to be incorrect.

A hospital is required to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances. *Shilkret v. Annapolis Emergency Hosp. Ass'n,* 276 Md. 187, 202, 349 A.2d 245 (1975). The general principles which govern in negligence cases ordinarily also apply in medical malpractice claims. *Id.* at 190, 349 A.2d at 247; *Benson v. Mays,* 245 Md. 632, 636, 227 A.2d 220 (1967); *Suburban Hosp. Ass'n, Inc. v. Mewhinney,* 230 Md. 480, 484, 187 A.2d 671 (1963). It is axiomatic that a qualified medical expert can render an opinion as to whether a hospital did or did not comply with the applicable standards of care and if so, whether said failure directly caused the injuries sustained, thus permitting a trier of fact to determine whether the hospital was negligent and if so, whether the negligence caused the injuries sustained. *See, Fink v. Steele,* 166 Md. 354, 171 A.49 (1934). Although before an expert may properly testify to his opinion, the record must reflect a sufficient factual basis for the formation of the opinion, *State, Use of Solomon v. Fishel,* 228 Md. 189, 179 A.2d 349 (1962) where there is no objection to the absence of the factual basis, evidence, otherwise inadmissible, may be considered by the trier of the fact. *See,* 30 Am. Jur. 2d, *Evidence* §1089 (1967) where it is stated:

> According to most courts, the fact that evidence which is introduced in a case may be, if objected to, incompetent evidence under some one or more exclusionary rules of evidence does not destroy its probative effect, if it is admitted without objection. It is the generally prevailing rule that relevant evidence received without objection may properly be considered, although it would have been excluded if objection had been made. *It follows that such evidence, where admitted without objection, has the*

*force and effect as though it were admissible under the established rules of practice.* It has been held that incompetent evidence admitted without objection may establish a fact, support a finding or sustain a judgment. (footnotes omitted; emphasis supplied).

*See also, Todd v. Ferrell,* 212 Md. 574, 580, 130 A.2d 581 (1957); *Weil v. Free State Oil Co. of Md.,* 200 Md. 62, 70, 87 A.2d 826 (1952); *Manor Coal Co. v. Balchumas,* 174 Md. 453, 462, 199 A. 534 (1938); *Robinson v. State,* 17 Md. App. 451, 462, 302 A.2d 659 (1973).

One of the testifying physicians, Dr. Robert Montgomery, although not relating "the standard of care which Suburban was required to meet at the time Mrs. Hahn was treated" did indeed opine that Suburban complied with the expected standard of care. The trial judge, at one point, asked Dr. Montgomery: "Did the hospital comply with the standard of care they expected of emergency rooms and follow up readings?" The doctor replied: "Yes, sir." At a later point, under cross-examination by Plaintiff's counsel, the following colloquy took place:

Q You had testified that the hospital met its standard of care owed to this patient just a few minutes ago.

A I don't recall whether I testified to that or not.

Q What's the basis upon which you feel that you are familiar with the standard of care a hospital owes to a patient under these circumstances?

A I am not familiar with that, sir.

Q So if you said a few minutes ago it met the standard of care, the jury should disregard that because you don't even know what it is, is that right?

A May I ask the court reporter to read back the precise thing that you are talking about?

Q If you don't know what the standard of care is, I
want to make it clear. If you don't know what
the standard or duty owed to this hospital was, I
am satisfied. Is that your position?

A My position is that I believe that Suburban
Hospital, in my personal opinion, that
Suburban Hospital was giving its patients
through its emergency room appropriate care
according to the standards of care at the time,
yes.

Although it is arguable that Dr. Montgomery's opinion was
based on an inadequate foundation (he never stated the
standard of care), the above testimony nevertheless came in
without objection. There having been no objection to or
motion to strike Dr. Montgomery's opinion that Suburban
Hospital complied with the applicable standards of care, it
had the force and effect of any other proper evidence. Its
*weight* was for the jury as triers of the facts to determine.

Although Dr. Montgomery failed to recite the standard of
care, it was forcefully related by Plaintiffs' star witness, Dr.
David. C. Abramson, as set forth in his direct examination:

Q Based upon your experience, your training up to
the current time, Doctor, would you say that
you are familiar with the standards of care of
the emergency room medicine practice in an
emergency room service such as Suburban
Hospital in Montgomery County in the period of
1977?

A Yes, I am very familiar with it.

* * *

Q Could you tell His Honor and the ladies and
gentlemen of the jury generally what this
document is and how it pertains, if it does, to the
practice of emergency medicine?

A This is a document called the Accreditation
Manual for Hospitals. It's put out by the JCAH
which is the Joint Commission on Accreditation

for Hospitals, and what it does is it tells us at the hospitals when they inspect us for accreditation what they are going to look at, what questions they are going to ask, and what minimum standards we have to do.

We are always allowed to do more or be more thorough than this Manual suggests, and they are happy when they see that, but this tells us the least that we have to do for them to accredit, or for them to give us accreditation and approve us to provide services to patients.

Q Aside from Exhibit 4, the Accreditation Manual, Doctor Abramson, are there also recognized standards of medical care that emergency room services of various hospitals such as the Suburban Hospital here in Montgomery County are required to adhere to?

A Yes, certainly.

Q The types of services in an emergency room's records, is this usually a part of the physical plan of a hospital?

A Most frequently in this area of the country the hospital provides the physical space, nursing personnel, technical personnel, all of the backups that are needed, and most directly in this country the physicians themselves are not hospital employees, but are independent physicians practicing emergency medicine in the hospitals.

Q Do the standards that I asked you about standards that pertain to the hospital, do these standards require the hospital to interrogate (sic) the services of the various departments of the hospital with emergency room service?

\* \* \*

A Yes, the hospital supplies all of the services to its patients that are not specifically and peculiarly the services of the private practicing physician.

\* \* \*

THE WITNESS:

Either true or suspected problems with heart or with the circulatory system exists in a little better than one out of every ten cases that come into the emergency room.

BY MR. PAULSON:

Q Would it be fair to say, then, that this is a rather frequent or common occurrence in the emergency room?

A Certainly, yes.

Q If a hospital such as Suburban Hospital in Montgomery County offers electrocardiographic services to the emergency room patients are there certain standards of care that are required of the hospital in the offering of these services to emergency room patients?

A Yes, there are.

Q Generally what are the standards?

A Okay, you have to understand the two-tiered system or the two different types of information that might be available from the electrocardiograms.

Through its emergency department the hospital must make available for every patient that comes in there the acute interpretation of those things which may have an emergency basis, and which may need treatment right away, the hospital must make that available to its emergency department patients.

Most hospitals should and do provide the second level of care, but that doesn't have to be immediately available. That can be at a later time. But the emergency care, the acute interpretation of what those squiggles on the

line mean in terms of life or death decisions for the patients must always be available at the hospital whenever the patient is there.

When asked "whether or not the hospital deviated from the accepted standard of care of a hospital..." Dr. Abramson responded, *inter alia:*

My opinion is that the hospital didn't meet the absolutely necessary standard of care in several ways... So I think the hospital was seriously below the acceptable standard in not providing accurate acute diagnosis on the electrocardiogram when Mrs. Hahn first came in, and if they had they would have kept her in the hospital, and the hospital was clearly below any acceptable standard when they didn't have the radio in a position where the physician could provide the necessary further input for at least a period of ten minutes more when Mrs. Hahn's heart was fibrillating, and when the paramedics, by their protocol could go no further without the physician telling them what to do and how to do it.

Thus, the jury had before it for its consideration on the standard of care issue generally, evidence of:

1. The standard of care as explicated by Dr. Abramson;
2. Its non-compliance with that standard as opined by Dr. Abramson;
3. Compliance with the standard as stated by Dr. Montgomery.

Additionally, as part of their overall claim of negligence, appellants contend that:

The Hospital had a further duty to maintain open radio communication with the rescue vehicle transporting her to the hospital. It breached that duty. As a result, the paramedics were unable to

defibrillate Mrs. Hahn when she went into ventricular fibrillation the second time.

As appellee correctly pointed out:

> Dr. William Jones, the physician who in fact treated and tried to revive Gloria Hahn on March 21, 1977, testified that on the day Gloria Hahn died, there were no complaints made to him by the paramedics that they could not reach Suburban Hospital on the radio and that in fact, there were three separate and independent means of communication for the paramedics to contact the Hospital.

Thus, this aspect of appellant's alleged negligence was propelled into the dominion of the trier of the facts in two respects:

1. The notation by a paramedic on a report that the volume on a radio had been turned down was subject to impeachment by the testimony of Dr. William Jones. The jury could have disbelieved that the volume on a radio had been turned down or they could have believed that other means of communications should have been used by the paramedics.

2. Considering Dr. Montgomery's testimony that the Hospital "was giving its patients through its emergency room appropriate care according to the standards of care at the time," the jury could have believed that the communications system was adequate.

As we stated in *Cavalier Mobile Homes v. Liberty Homes, Inc.,* 53 Md. App. 379, 454 A.2d 367 (1983):

> A directed verdict is inappropriate where there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact which if found to exist would prevent judgment for the moving party. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 328-29,

389 A.2d 887 (1978). All facts and the inferences reasonably deducible therefrom must be considered in the light most favorable to the party against whom the motion for a directed verdict is made.

Considering the facts and the inferences reasonably deducible therefrom, as heretofore mentioned, in a light most favorable to Suburban, the trial judge was correct in submitting the case to the jury. That the jury apparently chose to give little weight to appellants' star expert witness does not constitute legal error.

*Judgment affirmed; appellants to pay costs.*