537 A.2d 635

**Dorothy Virginia BROWN, et vir.**

v.

**Harinath S. MEDA.**

**No. 581, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

March 2, 1988.

Certiorari Granted June 24, 1988.

Gilbert H. Robinette (Henry E. Dugan, Jr. and Robinette, Dugan & Jakubowski, P.A., on the brief), Baltimore, for appellants.

Ronald U. Shaw (Stephen J. Hughes and Miles & Stockbridge, on the brief), Baltimore, for appellee.

Argued before MOYLAN, WEANT and POLLITT, JJ.

POLLITT, Judge.

Dorothy Virginia Brown and her husband, Rudolph S. Brown, appeal from a judgment notwithstanding the verdict entered in the Circuit Court for Baltimore City, which set aside a jury verdict in the amount of $600,000 in favor of the Browns against Dr. Harinath S. Meda and entered judgment in favor of Dr. Meda. The appellants present four questions on appeal, which they state as:

    I.  Whether a motion for judgment or motion for judgment n.o.v. can ever be granted against a Plaintiff who

won at the arbitration proceedings and who has not rejected the arbitration award.

II.  Whether the trial court erred in granting the motion for judgment n.o.v. as a matter of law.

III.  Whether the trial court erred in granting the motion for judgment n.o.v.

IV.  Whether the doctrine of *res ipsa loquitur* should apply to medical malpractice cases.

### Background

On 11 February 1980, Dorothy Virginia Brown underwent bilateral breast biopsy surgery.  Mrs. Brown alleged that following this operation she experienced symptoms of ulnar nerve injury, but had no symptoms prior to the procedure.  She alleges that she continues to suffer severe and painful disabling injuries and must continue to receive hospital and medical care.

Mrs. Brown and her husband filed an action for medical malpractice against appellee, Harinath S. Meda, M.D., and against Ronald H. Fishbein, M.D., Jacob C. Handelsman, M.D., Alvaro Jarez, M.D., Bonnie Plichta, Sinai Hospital of Baltimore, Inc., S. Goode, R.N., and L. Penix, R.N., asserting that she received an ulnar nerve injury to her right arm during the breast biopsy as the result of the improper positioning of her arm while she was unconscious.  The original action was filed on 25 January 1983 with the Health Claims Arbitration Office.

The case was heard by the Health Claims Arbitration Panel beginning 29 April 1985.  Prior to the hearing, appellants dismissed with prejudice their claims against everyone except Plichta, Sinai Hospital, and Dr. Meda.  Subsequently the arbitration panel granted the motions for judgment filed by the remainder of the health care providers at the close of plaintiffs' case, leaving only the claim against Dr. Meda, who had allegedly administered the anesthetic during the surgery.  The panel determined Dr. Meda was solely liable

for negligently causing Mrs. Brown's nerve injury and awarded her $300,000.

Dr. Meda filed a notice of rejection of the arbitration panel's award and the Browns subsequently filed a complaint and election for jury trial. Their complaint alleged that Dr. Meda was negligent in that he, his agents, servants and employees, failed to position Mrs. Brown's arm properly for the surgical procedure and failed to monitor the position of her arm carefully while she was unconscious.

Appellee's motion for judgment at the conclusion of the evidence (Rule 2–519) was denied and, as previously stated, the jury awarded appellants damages of $600,000. Appellee then moved for judgment notwithstanding the verdict. (Rule 2–532) Relying on this Court's holding in *Hans v. Franklin Square Hosp.*, 29 Md.App. 329, 347 A.2d 905 (1975), *cert. denied*, 276 Md. 744 (1976), the trial court found that the testimony of appellants' expert witnesses, both before the arbitration panel and before the jury, "rested upon inferences and thus constituted the kind of *res ipsa loquitur* evidence barred by *Hans*," and granted the motion. This appeal followed.

### I and II

■ Appellants first assert that neither a motion for judgment nor a motion for judgment notwithstanding the verdict can ever be granted against a plaintiff who prevailed before the Health Claims Arbitration Panel and did not reject the award. They posit, therefore, that the judgment granted in this case is erroneous as a matter of law. The basis for this argument is Maryland Code (1974, 1984 Repl.Vol., 1987 Cum.Supp.) § 3–2A–06(d) of the Courts and Judicial Proceedings Article, which states:

(d) *Admissibility of award; presumption of correctness.*—Unless vacated by the court pursuant to subsection (c), the unmodified arbitration award is admissible as evidence in the judicial proceeding. The award shall be presumed to be correct, and the burden is on the party rejecting it to prove that it is not correct.

Appellants are correct when they assert that the statute shifts the burden of proof, *Hahn v. Suburban Hosp. Ass'n,* 54 Md.App. 685, 461 A.2d 7 (1983), but they are incorrect when they assert that a motion for judgment or a motion for judgment notwithstanding the verdict can never be granted in favor of the party bearing the burden of proof. In *Attorney General v. Johnson,* 282 Md. 274, 293, 385 A.2d 57, 68 (1978), the Court of Appeals said:

We begin by pointing out exactly what the statute provides in this regard: that the award is admissible as evidence, that it "shall be presumed to be correct, and [that] the burden is on the party rejecting it to prove that it is not correct." § 3–2A–06(d). *The effect of this provision is precisely the same as occurs under the Workmen's Compensation Act,* which provides that the Commission's decision is "prima facie correct and [that] the burden of proof shall be upon the party attacking the same." Md.Code (1957, 1964 Repl.Vol.), Art. 101, § 56(c). [emphasis added, bracketed material in original]

As was clearly stated by the Court in *Moore v. Clarke,* 171 Md. 39, 45, 187 A. 887, 890 (1936):

It nowhere appears in the statute that the Legislature intended that any party to a proceeding before the Commission could secure a right through the Commission's error, but, on the contrary, the clear intention of the statute is that no rights shall accrue under it except upon facts proved or otherwise established sufficient to support the right asserted. The provision that the decision of the Commission shall be *"prima facie correct"* and that the burden of proof is upon the party attacking the same does not mean, therefore, that if no facts are established before the Commission sufficient to support its decision, that there is any burden of factual proof on the person attacking it, for the decision of the Commission cannot itself be accepted as the equivalent of facts which do not exist, and, in all cases, whether there is evidence legally sufficient to support the decision of the

Commission is necessarily a matter of law to be decided by the court as any other question of law would be. *See also Md. Bureau of Mines v. Powers,* 258 Md. 379, 383, 265 A.2d 860, 862 (1970), and cases there cited.

As previously noted, in ruling on the motion for judgment notwithstanding the verdict, the trial judge determined as a matter of law that there was no legally sufficient evidence of negligence before either the arbitration panel[1] or the jury. If those findings were correct, to be discussed *infra,* the trial judge did not err in granting the motion for judgment notwithstanding the verdict *as a matter of law.*

## III

Appellants next assert that it was error to grant the motion for judgment notwithstanding the verdict because there was evidence to support the verdict of the jury. In considering this question, of course, we are obliged to resolve all conflicts in the evidence in favor of appellants and to assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the right of the appellants to recover. *Fleming v. Prince George's County,* 277 Md. 655, 358 A.2d 892 (1976).

Viewed in that light, the evidence discloses that Mrs. Brown was admitted to Sinai Hospital in Baltimore City for biopsies of her breasts to determine the presence or absence of cancer. The surgery was performed by Dr. Fishbein under general anesthesia administered by the appellee, Dr. Meda. Prior to the surgery she had experienced no problems with the right ulnar nerve. After the surgery, she experienced considerable pain in her right arm, which despite further surgery, physical therapy and other medical

---

1. Appellants also argue that the sufficiency of the evidence before the arbitration panel should have been raised by appellee by way of a preliminary motion to vacate the award pursuant to Maryland Code (1974, 1984 Repl.Vol., 1987 Cum.Supp.), § 3–2A–06(c) of the Courts and Judicial Proceedings Article. Grounds for vacating the award are set forth in §§ 3–223(b), 3–224(b), and 3–2A–05(h). Sufficiency of the evidence is not among them.

treatment, still persists. During surgery, it is necessary that the patient's arms be positioned and secured in a particular manner. Although Dr. Meda had no specific recollection of positioning Mrs. Brown's right arm, he acknowledged that is the responsibility of the anesthesiologist. He further agreed that it would be a violation of the standard of care for an anesthesiologist not to position the arm properly to protect the ulnar nerve from injury.

Dr. Gary Belaga, a neurologist, testified that he first saw Mrs. Brown in December of 1982. He reviewed her medical records back to and including the operation. She began to experience difficulty with the ulnar nerve in her right arm shortly after the operation. He ruled out other possible causes of ulnar nerve injury, such as leprosy, lead poisoning and activities such as prolonged use of a jackhammer. He looked for "some incident in her life where her arm would be immobilized for a long period of time in the position where it would be vulnerable to pressure in a circumstance where she would not be able to respond to that." He then said:

> We have a perfect scenario with the operative procedure which occurred in February of 1980.
>
> Her arm was strapped on a board, cushion board, but nonetheless pressure was abnormally applied to the ulnar area around the elbow and it was left there in a period of time and the patient was overcome with anesthesia, could not move it, take the pressure off or even report to her doctors that this happened.
>
> We know that it happened at that time in addition because the proximity to the onset of her symptoms.

His opinion, based on reasonable medical probability, was that she suffered a compression injury to the nerve at the time of the operation; that there was a departure from the appropriate standard of care in that there was a failure adequately to protect that part of her right arm to prevent damage to the nerve; and that departure from the standard of care caused the injury. He had no personal knowledge as to precisely how the arm was positioned, and nothing in

the medical records revealed that information. He said, "I did not see what happened, but I can reconstruct it." The standard of care requires adequate protection of the nerve. In summary, the basis for his opinion was:

The basis for that opinion is that she has a—she had a compressive neuropathitor pressure palsy to the ulnar nerve.

\* \* \* \* \* \*

The nerve is compressed. It was damaged....

\* \* \* \* \* \*

If it is properly placed, it won't happen.

Dr. John Rybock, a neurological surgeon, testified substantially the same as Dr. Belaga. His opinion was that Mrs. Brown sustained an injury to the ulnar nerve as a result of pressure to that nerve while under general anesthesia during the operation; that there was a deviation from the appropriate standard of care in that Dr. Meda failed adequately to protect the nerve; and that deviation from the standard caused the injury. The basis for his opinion was:

Because in my opinion, the only standard of care is that the ulnar nerve be protected and be kept from injury and the fact that it was injured therefore tells me that there was a deviation from the standard of care.

We agree with appellee that this evidence, primarily, implies negligence from the happening of the event, sometimes called *res ipsa loquitur*. We do not agree, however, that the evidence could not support the verdict of the jury in this case.

## IV

It is well established that three elements must coalesce before *res ipsa loquitur* may be invoked:

1) The injury is of a nature that would not ordinarily occur in the absence of negligence;

2) The defendant had exclusive control of the instrument which caused the injury; and

3) The plaintiff did not contribute to the injury.
*Stevens v. Union Memorial Hosp.*, 47 Md.App. 627, 631, 424 A.2d 1118, 1120 (1981).

Initially, appellee insists that his negligence may not be inferred in this case because appellants have failed to establish that the instrumentality causing the injury was within his exclusive control. He says this case is similar to *Stevens.* We disagree. There, a child's face was blistered during a tonsillectomy. There was no testimony presented as to how the injury was inflicted. Present in the operating room at the time were the surgeon, the anesthesiologist, a scrub technician, and a circulating nurse. Neither of the two nurses were sued, deposed, or served with interrogatories. With no evidence as to how the injury occurred, Chief Judge Gilbert said for the Court:

> We cannot assume that of the four persons present in the operating room that only one or two of them or the hospital itself is the responsible party or parties.
>
> \*   \*   \*   \*   \*   \*
>
> The facts of the instant case give rise to a rational inference, founded on ordinary experience, that when four persons other than the victim are in attendance at the happening of an accident, any one or more of the four may have caused the accident.

*Stevens, supra,* 47 Md.App. at 631–32, 424 A.2d at 1121.

The evidence in the case before us does not support the same inference.

Dr. Meda testified as an adverse witness for appellants. He acknowledged that he had testified before the Health Claims Arbitration Panel that he had positioned Mrs. Brown's arm on the board at the beginning of the operation. His testimony at trial was, while he could not recall specifically that he had done so, the usual procedure was that he did and, in any event, it was his responsibility as the anesthesiologist to assure that the arm was positioned properly, and to check it once it was in position. He acknowledged there was nothing in the records to indicate

the arm ever changed position during the surgery and there would have been no reason for any change. He agreed that the appropriate standard of care requires the proper positioning of the arm on a well padded accepted arm board, and it would be a violation of that standard for an anesthesiologist not to position the arm properly so as to protect the ulnar nerve.

Dr. Fishbein testified that he had no specific recollection of events during the operation and recalled nothing unusual. The usual procedure would be that the anesthesiologist would position the arms and there would be no reason to change them. He "presumed" that is what occurred in this case.

Nurse anesthetist Plichta had no specific recollection of the occasion but testified that had she repositioned the arm she would have so noted on the charts. Although she had relieved Dr. Meda 30 minutes before the completion of the operation, Drs. Belaga and Rybock opined the negligent act was in the original positioning of the arm.

All this evidence, taken in the light most favorable to appellants' right to recover, could reasonably support a finding by the jury that the positioning of the patient's arm on the board was the exclusive responsibility of the appellee.

In *Streett v. Hodgson,* 139 Md. 137, 115 A. 27 (1921), the Court of Appeals for the first time was presented with the precise question of whether *res ipsa loquitur* applies to cases of alleged medical malpractice. Judge Adkins said for the Court:

> The reasoning of the courts which hold that the maxim does not apply in such cases seems more in consonance with the principles governing the relations generally between physicians and patients as announced by this Court in numerous cases. See *State, Use of Janney v. Housekeeper,* 70 Md. [162 at] 171; *Dashiell v. Griffith,* 84 Md. [363 at] 380; *Miller v. Leib,* 109 Md. 414 [at 426]. At any rate, in the absence of evidence from which, without

speculating, the jury could draw a reasonable inference from the mere happening of such an accident, it should not be permitted to infer negligence from the occurrence alone.

*Streett, supra,* 139 Md. at 149, 115 A. at 30.

The Court held the jury was properly instructed it could not infer negligence from the single fact that a patient was burned by an x-ray machine. The cases cited by the Court embraced the principle that since it is the duty of professional men to exercise ordinary skill, it will be presumed that they did so, in the absence of proof to the contrary. That same principle had been stated in *Angulo v. Hallar,* 137 Md. 227, 233, 112 A. 179, 181 (1920), where the Court said:

> But while it is the duty of the professional man to exercise ordinary care and skill, a duty imposed upon him by law, it will be presumed, in the absence of proof to the contrary, that the operation or work done by him was carefully and skillfully done. And because of such presumption, want of skill, or negligence, cannot be presumed, but must be affirmatively proven.

In that case the plaintiff's medical witness was not asked what caused the injury and did not attempt to say it was caused by anything the defendant did or did not do. The Court held there was absolutely no evidence that the professional acts of the defendant did in fact cause the injury and there was no evidence of negligence.

The presumption of proper performance by professionals was reiterated in *Fink v. Steele,* 166 Md. 354, 171 A. 49 (1934) and *State v. Eye, Ear, Etc., Hospital,* 177 Md. 517, 10 A.2d 612 (1940). *See also State, Use of Solomon v. Fishel,* 228 Md. 189, 203, 179 A.2d 349, 357 (1962).

Citing to the aforementioned decisions, the Court has said on several occasions, "The doctrine of *res ipsa loquitur* does not apply." *Bettigole v. Diener,* 210 Md. 537, 541, 124 A.2d 265, 267 (1956); *Lane v. Calvert,* 215 Md. 457, 463, 138 A.2d 902, 905 (1958); *Johns Hopkins Hospital v. Genda,*

255 Md. 616, 625, 258 A.2d 595, 600 (1969); *Nolan v. Dillon,* 261 Md. 516, 534, 276 A.2d 36, 46 (1971).

While not always explicitly stated, the rationale for these holdings is that the first element of the three-part test—that the injury is one that would not normally occur absent negligence—must be based on the common knowledge of the jury, which would not be true in a medical malpractice case because medical procedures are not a matter of common knowledge.

An examination of several other cases, however, reveals that the Court did not mean precisely what it seemed to say, *i.e.,* that *res ipsa loquitur* can *never* apply to medical malpractice cases. The Court frequently has said that when the common knowledge of laymen is extensive enough to recognize or infer negligence from the facts, the jury may do so without the aid of expert testimony, thus applying *res ipsa loquitur.* The Court has recognized there is no necessity for expert testimony to show that a dentist should not pull the wrong tooth, *McClees v. Cohen,* 158 Md. 60, 148 A. 124 (1930), that a physician should not drop a scalpel or a knife on a patient causing him to be cut or drop some fluid causing him to be burned, *Johns Hopkins Hospital v. Genda, supra,* amputate the wrong limb or leave a foreign object in a patient's body, *Central Cab Co. v. Clarke,* 259 Md. 542, 270 A.2d 662 (1970), or leave unattended a patient who has been hit by an automobile when the possibility of life-threatening internal injuries is obvious. *Thomas v. Corso,* 265 Md. 84, 288 A.2d 379 (1972). Similarly, this Court has said that expert testimony is not required to demonstrate that physicians and hospitals should not use a non-sterile needle in the performance of a biopsy. *Suburban Hosp. Ass'n v. Hadary,* 22 Md.App. 186, 322 A.2d 258 (1974).

██ The presumption that a physician properly performed his duties was simply an extension of the maxim that all persons are presumed to have duly performed any duty imposed upon them and that negligence cannot be

presumed but must be affirmatively proved. *State, Use of Janney v. Housekeeper, supra,* 70 Md. at 171, 16 A. at 384. It is merely a redundant statement of the assignment of the burden of proof. *Riffey v. Tonder,* 36 Md.App. 633, 375 A.2d 1138, *cert. denied,* 281 Md. 745 (1977).

The general principles which ordinarily govern in negligence cases also apply in medical malpractice claims.... Therefore, as in any other case founded upon negligent conduct, the burden of proof rests upon the plaintiff in a medical malpractice case to show a lack of the requisite skill or care on the part of the defendant.... But, whereas the conduct of the average layman charged with negligence is evaluated in terms of the hypothetical conduct of a reasonably prudent person acting under the same or similar circumstances, *the standard applied in medical malpractice cases must also take into account the specialized knowledge or skill of the defendant.* [citations omitted, emphasis added].

*Shilkret v. Annapolis Emergency Hosp.,* 276 Md. 187, 190–91, 349 A.2d 245, 247 (1975). The emphasized portion of that statement is simply another way of saying that, in a case involving complex medical procedures or the exercise of professional skill and judgment, a jury is not qualified to determine whether there was unskilled or negligent treatment without the aid of expert testimony. But when expert testimony is presented from which the jury can reasonably determine all the elements necessary to recovery, a *prima facie* case is established.

"A *prima facie* case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of."

*Weimer v. Hetrick,* 309 Md. 536, 553, 525 A.2d 643, 651 (1987), quoting *Waffen v. U.S. Dept. of Health & Human Services,* 799 F.2d 911, 915 (4th Cir.1986).

■ In the case before us the jury could find the establishment of the standard of care without drawing any

inferences. Drs. Belaga and Rybock testified that the appropriate standard of care required only that the arm be positioned in such a manner as to protect the ulnar nerve from injury. Appellee acknowledged that standard. Establishment of the breach of the standard, and the causal relationship between the breach and the ensuing harm, required reliance on inference. Although Drs. Belaga and Rybock pointed to a specific act of alleged negligence—the positioning of the arm—they could not testify precisely how the arm was positioned. We believe, however, their testimony showed bases for the formation of rational conclusions much more than mere conjecture. They testified they had ruled out other possible causes and that the injury could have been caused only by the negligent positioning of the arm. If the jury believed that testimony, that evidence was such as to make the plaintiffs' theory reasonably probable, not merely possible, and more probable than any other hypothesis, supporting an inference that the harm resulted from defendant's negligence rather than from some other cause. *State v. Eye, Ear, Etc., Hospital, supra,* 177 Md. at 527, 10 A.2d at 617.

As we have seen, both the Court of Appeals and this Court have applied *res ipsa loquitur* to medical malpractice cases in situations where the common knowledge and experience of laymen is extensive enough to infer negligence from the facts. Several courts have held that the common knowledge and experience of ordinary jurors would tell them that, in the ordinary course of events, one undergoing surgery does not sustain an unusual injury to a healthy part of his body in an area other than the area of the operation in the absence of negligence. *Wiles v. Myerly,* 210 N.W.2d 619 (Iowa 1973); *Beaudoin v. Watertown Memorial Hospital,* 32 Wis.2d 132, 145 N.W.2d 166 (1966); *Horner v. Northern Pacific Ben. Ass'n Hospitals,* 62 Wash.2d 351, 382 P.2d 518 (1963); *Frost v. Des Moines Still College of Osteo. & Surg.,* 248 Iowa 294, 79 N.W.2d 306 (1956); *Carranza v. Tucson Medical Center,* 135 Ariz. 490, 662 P.2d 455 (App.1983). When that common knowledge and experi-

ence is substantiated by expert testimony to the same effect, it would seem that the application of *res ipsa loquitur* is even more appropriate. *See, e.g., Van Zee v. Sioux Valley Hospital*, 315 N.W.2d 489 (S.D.1982); *Jones v. Harrisburg Polyclinic Hospital*, 496 Pa. 465, 437 A.2d 1134 (1981); *Parks v. Perry*, 68 N.C.App. 202, 314 S.E.2d 287 (1984) (where the evidence was virtually indistinguishable from the evidence in this case); *Holloway v. Southern Baptist Hospital*, 367 So.2d 871 (La.App.1978); *Matlick v. Long Island Jewish Hospital*, 25 A.D.2d 538, 267 N.Y.S.2d 631 (1966).[2]

We find those cases persuasive. We think the general knowledge and experience of ordinary jurors, particularly when supported by expert medical testimony that such injuries are not risks ordinarily inherent to the surgical procedure in question, is such that the jurors may infer negligence from an unusual injury to a healthy part of the patient's body remote from the area of the operation.

We see nothing herein which is inconsistent with any previous holding of the Court of Appeals. As we noted in *Hans*, the prerogative of that Court to change *its* mind has not been extended to us, but we believe, that if confronted with the question, that Court would say the evidence in this case, considered in the light most favorable to the appellants, supported the verdict of the jury, and we so hold.

---

**2.** As have courts throughout the country, the cases cited have considered this question as one of *res ipsa loquitur*. The parties have presented it in those terms and we have so considered it. That Latin phrase, literally translated "the thing speaks for itself," was first used in a negligence case by Justice Baron Pollock of the English court of Exchequer in 1863. It is merely a short way of saying that the circumstances attendant upon an accident are themselves of such a character as to justify a *jury* in inferring negligence as the cause of that accident. *Strasburger v. Vogel*, 103 Md. 85, 89, 63 A. 202 (1906). It permits the *fact finder* to infer negligence from the "thing" itself. Despite substantial authority to the contrary, when the "thing" speaks not to the fact finder but to an expert witness, and the witness, not the fact finder, draws the inference, it may not be true *res ipsa loquitur* at all. Whether we refer to the facts herein as *res ipsa loquitur* or as proof of negligence by circumstantial evidence the result is the same.

**346**

We recognize this is somewhat inconsistent with our holding in *Hans v. Franklin Square Hosp., supra.* With due regard to the doctrine of *stare decisis,* to the extent of such inconsistency that holding is overruled.

JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED; JUDGMENT ENTERED FOR APPELLANTS ON THE VERDICT OF THE JURY; APPELLEE TO PAY THE COSTS.