# WEIL *v.* FREE STATE OIL COMPANY OF MARYLAND ET AL.

## (Two Appeals in One Record)

### [No. 130, October Term, 1951.]

64

*Decided April 9, 1952.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Melvin J. Sykes* and *Emanuel Gorfine,* with whom was *Morton J. Hollander* on the brief, for the appellant.

*Robert E. Clapp, Jr.,* and *Herbert R. O'Conor, Jr.,* with whom were *George W. McManus, Jr.,* and *Mathias & Mathias* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

The Free State Oil Company of Maryland and the Free State Oil Company of Virginia (herein referred to as "Maryland" and "Virginia", respectively) each brought suit on the common counts against Congress Oil Company, a Delaware corporation, and Irving H. Weil, to recover for certain deliveries of oil products to Congress upon Weil's request. Congress was not summoned, and after bills of particulars had been filed

on demand of Weil, and demurrers overruled, general issue pleas were filed, the cases were consolidated and went to trial before the the the court and a jury. The appellant moved for a directed verdict at the close of the plaintiff's case and renewed the motion at the close of the whole case. The court reserved ruling on the motions and the jury rendered verdicts of $17,784.61 in the Maryland case and $6,876.50 in the Virginia case. Motions for judgment N. O. V. were overruled in each case and judgments entered on the verdicts, from which the appeals come here.

The appellees have moved to dismiss the appeals on the ground that the appellant has not printed all of the material evidence to enable us to pass upon its legal sufficiency. They have printed in their appendix the evidence they contend was improperly omitted. As we indicated in *Sunshine Laundry v. White,* 197 Md. 582, 586, 80 A. 2d 1, 3, and again in *Kenny v. McAllister,* 198 Md. 521, 525-526, 84 A. 2d 897, 899, if the appellees supply the omitted matter, so that we can consider the case without reference to the transcript, we would not necessarily dismiss the appeal, although we might consider the point in the award of costs.

The cases were tried below upon the theory that Weil had verbally guaranteed the accounts in question, and that he had such a financial interest in Congress as to take his promise out of the Statute of Frauds. The defense was that Weil had no such interest in Congress, and that he made no promises to be personally liable, but acted throughout on behalf of Congres. On appeal, the appellant admits in his brief that "it is taken as established because of the verdict (but only for the purposes of this appeal) that the appellant did make certain promises guaranteeing the credit of Congress on January 10, 1950 and that these promises were not required to be in writing because of appellant's financial interest in the Congress Oil Company". The effect of this concession is that the appellant does not contest the proof to support a judgment in favor of Virginia for $3,867.29,

representing deliveries of 200,000 gallons of oil from January 10, 1950 to February 21, 1950. He contends, however, that there was no legally sufficient evidence to support the judgments in excess of that amount. He contends that the testimony printed by the appellees sheds no light on that issue. His own testimony and that of Raskin, President of Congress, consists of denials of any promises, which could hardly help the appellees' case. Some of the testimony of the appellees' witnesses, printed by the appellees, was printed by the appellant, and some of it is merely cumulative. We think there is at least "reasonable ground for difference of opinion" as to the materiality of the additional matter printed. *Kenny v. McAllister, supra.* An appellant can, of course, abandon some of the issues raised below and stand here on a narrower ground. We think the case of *Lane Manor Corporation v. Byers,* 199 Md. 406, 86 A. 2d 731, is distinguishable both because the missing testimony was not supplied and the questions of estoppel and credibility there raised required consideration of all the evidence, not merely that most favorable to the plaintiff in order to determine legal sufficiency. Cf. *Klein v. Dougherty,* 200 Md. 22, 87 A. 2d 821. We think the motion in the instant case must be denied.

The appellees contend that the motions for directed verdicts at the close of the entire case were too broad and did not raise the narrower issue or specify the grounds thereof. At the close of the plaintiff's case there was an extended discussion with the court in support of motions for directed verdicts, in the course of which counsel for the appellant argued at length that the testimony would not support a promise to pay for more than 200,000 gallons of oil chargeable to the Virginia account. The point was clearly made but the court reserved its ruling. It is true that the appellant lost the benefit of those motions when he produced testimony in defense (*Smith v. Carr,* 189 Md. 338, 56 A. 2d 151), but we find nothing in that testimony to bolster the proof on the point. At the close of the whole case

the appellant renewed the motions without argument, the court ruling that "the motion stays under advisement". We have no doubt that the point was in the court's mind, although there may not have been a technical compliance with Rule 4 of the Rules of Practice and Procedure, III, Trials. In any event we think the appellant's second prayer, which was refused by the court, clearly sought to limit recovery by Virginia to an amount representing the price of 200,000 gallons of oil.

The appellee corporations were virtually under the same management. Rogers was President of Maryland, Gilbert, Credit Manager, Callis, his assistant, and Forestell, Sales Manager. Rogers was Vice President of Virginia, Gilbert, Secretary-Treasurer, and Callis, Credit Manager. On April 1, 1950 Whitney succeeded Rogers and became President of both companies. Beginning in the latter part of 1949, both companies sold oil to Congress, and on January 10, 1950 Congress owed them $10,497.62. It was known that Weil, who had a controlling interest in Weil Brothers, Incorporated, had a financial interest in Congress. It developed that he owned $800.00 worth of its stock, held conditional contracts of sale on certain of its trucks, he and his wife had loaned about $2,400 to Congress on its notes, and Congress owed Weil, or Weil, Incorporated, various sums representing oil sold on open account. Raskin had been a former employee of Weil.

Rogers testified that in August 1949, Weil brought Raskin to his office and asked that they extend credit to Congress. Rogers had known Weil for years and thought he was thoroughly responsible. When asked if Weil guaranteed the account at that time, he said: "No sir, my claim is Mr. Weil came in for Congress Oil at that time and if we gave any aid to Congress Oil he would see it was paid". Q. "The assurance Mr. Weil first gave you then was in August, 1949; is that right or wrong? A. No he didn't give me any assurance in 1949. He didn't owe us anything at that time." Nevertheless, Rogers testified in cross-examination that Weil "always assured

us that he would take care of any credit we allowed
Congress Oil". On January 10, 1950, Congress owed
the appellees $10,479.62 for oil delivered, and a con-
ference was held at the instance of Weil, who wanted
more oil and more credit. The meeting was attended by
Weil, Raskin, Rogers, Gilbert and Forestell. Rogers told
him his account was too high, but that they had some
oil in Washington and if Weil would assure him that
Virginia would be paid he would approve the sale. Weil
promised to "see the money is paid". Gilbert was called
in at that point, and asked if he would approve a further
extension of credit. He said he would not approve on
the basis of Congress' financial statement, but if Weil
would guarantee payment "he can have all the oil he
wants". Weil "said okay". Rogers testified that Weil
"gave me his word and assurance at the time the 200,000
gallons [deal] was made he would see Mr. Raskin paid
Free State right up to date and he would see the price
for the 200,000 gallons was paid in thirty days. * * *
he wasn't to get the 200,000 till the past debt was cleared,
which I understand has been cleared." When asked if
there was a limit on the January deal, he said: "He
definitely set a limit up on the last deal he made on the
200,000 gallons." There was no limit on the prior deals,
"outside of his assurance he would see Congress paid
us". Forestell testified that when Gilbert was called
in to approve the 200,000 gallons deal he said he would
approve it if Weil would agree "to stand behind it",
and Weil guaranteed "payment for the 200,000 gallons
of fuel oil". Forestell denied that Weil promised to pay
the outstanding balance at that time.

Whitney, who was not present at the meeting on Jan-
uary 10, but succeeded Rogers as President on April 1,
testified on cross-examination that Rogers told him Weil
"made this deal on 200,000 gallons of oil and he was
going to see that all moneys due the Congress Oil Com-
pany were paid—not only the 200,000 gallons, but any
money due Congress Oil Company." Q. "Then Mr.
Rogers told you Mr. Weil would be liable for anything

that the Congress Oil Company had done or would do? A. That is correct." Q. "But I am asking, Mr. Rogers told you Mr. Weil made no limitation as to time or money? A. No, sir. Q. In substance, you were just given a blank check? A. That is correct, sir."

After the meeting of January 10, quantities of oil and oil products greatly in excess of 200,000 gallons were delivered both by Maryland and Virginia up to March 29, 1950, when deliveries were stopped. There was no evidence that the extent of the deliveries was brought to Weil's specific attention. It was admitted that no copies of the invoices were sent to him. Gilbert testified he pressed Weil for payment prior to that date, but Weil merely told him to push Congress and he would do likewise. On March 29 Forestell talked to Weil about three bad checks of $2,000 each that Congress had given. Weil said Congress would make them good. Weil also told Rogers and Whitney on the same day that the checks would be paid and the balance paid in ninety days. On April 6, Weil told Forestell and Gilbert not to worry about the checks, he would see they were paid. On April 14 Whitney demanded a show down and asked Weil for his note for the balance of some $32,000, or at least a written schedule of payments. Weil refused, and Whitney threatened legal action. Weil said if he "rocked the boat legally the chances are you are not going to get a dime". Whitney refused to delay legal action. The result of the meeting, as evidenced by a written memorndum dictated by Whitney and sent to the other officers of Maryland and Virginia, was that Weil agreed to see that the checks were paid before April 30, and the overdue balance within ninety days from April 30; that Weil did not want any more oil delivered to Congress. The memorandum urged that the officers press Weil every two or three days. Raskin drew a check for $6,000 on April 28, which cleared. The balance was still unpaid when suit was filed on July 28, 1950.

The appellant now concedes that the testimony as to Weil's promises on January 10 would support a verdict

for the price of 200,000 gallons of oil, in other words, that the jury might properly find that the words imported a personal undertaking. It would seem to follow that the words used in connection with the prior deals would likewise import a personal undertaking. It is true that Rogers' testimony that Weil "came in for Congress" in 1949, and did not "give me any assurance * * * he didn't owe us anything at that time", is equivocal, even though coupled with the statement that Weil said "if we gave any aid to Congress he would see it paid". Perhaps Rogers was confused as to the meaning of the word "assurance". In any event, we are not so much concerned with Rogers' personal interpretation of the words used, as with their legal import. *Williston, Contracts* (Rev. ed.) § 66; *Walton v. Hospital Association*, 178 Md. 446, 450. "The law is established that where the existence of an oral contract is disputed, and the testimony is also conflicting as to its terms, it is for the jury to determine whether the contract did in fact exist and what it actually was." *Snyder v. Cearfoss*, 187 Md. 635, 642, 51 A. 2d 264, 267. The testimony of Whitney indicates that Rogers did in fact rely upon these earlier promises as a guaranty. While Whitney's testimony was hearsay, we recognize the general rule that "objectionable evidence admitted without objection has the force and effect of proper evidence". *Laporte Corporation v. Cement Corporation*, 164 Md. 642, 649, 165 A. 195, 198, 168 A. 844, 108 A. L. R. 1474. See also *Slingluff v. Builders' Supply Co.*, 89 Md. 557, 562, 43 A. 759. This is particularly true where it is elicited by the opposite party. *Heil v. Zahn*, 187 Md. 603, 606, 51 A. 2d 174. See also note, 104 A. L. R. 1130.

The appellant contends, however, that even if there was an earlier guaranty unlimited in its scope any and all prior undertakings were terminated on January 10, and from that point forward the only liability was for 200,000 gallons of oil and payment of the outstanding balances which were in fact paid during January. It is clear that the earlier promises were in the nature

of a continuing offer to be accepted from time to time by deliveries and to continue until countermanded. *Grant v. Ridsdale,* 2 H. & J. 186. Until delivery, such a contract is executory, but specific notice of acceptance need not be communicated in the absence of an agreement to that effect. *Brokerage Co. v. Harrison,* 141 Md. 91, 104, 118 A. 192. Such an offer is revocable, upon due notice, at any time before particular deliveries are made. *Union Trust Co. v. Knabe,* 122 Md. 584, 606, 89 A. 1106. However, there is no evidence that Weil ever revoked the offer; he was asking for further credit. Nor were the appellees unwilling to continue deliveries if Weil would guarantee them. The appellant argues that the appellees rejected the standing offer when they accepted Weil's agreement to pay for the 200,000 gallons; that if the prior arrangement had been satisfactory there would have been no occasion for the meeting of January 10. That meeting, however, was sought by Weil. The appellees were merely seeking payment of the outstanding balances, not questioning Weil's credit or seeking to limit it. We think there was legally sufficient evidence from which the jury could find that the specfic undertaking as to the 200,000 gallons was cumulative and not a rejection of the continuing offer. *Bridgeport Bank v. Union Co.,* 242 Pac. 13 (Wash.). Cf. *Crowe v. Covington Trust Co.,* 297 Ky. 737, 181 S. W. 2d 245, and *Bastow v. Bennett,* 3 Campb. 220, 170 Eng. Repr. 1360. See also *Lumiansky v. Tessier,* 213 Mass. 182, 186, 99 N. E. 1051, Am. Cas. 1913E, 1049; *First National Bank of Waterloo v. Story,* 200 N. Y. 346, 93 N. E. 940, 34 L. R. A., N. S., 154; and note, 81 A. L. R. 790, 795. The fact that a creditor desires a more specific assurance is not necessarily controlling. *American Woolen Co. v. Moskowitz,* 159 App. Div. 382, 144 N. Y. S. 532.

We may assume that the alleged promises made by Weil after March 29, if not within the Statute of Frauds, were without consideration and hence unenforceable. *Smith v. Easton,* 54 Md. 138, 147. See also *Crown Realty v. Weinstein,* 177 Md. 260, 263, 9 A. 2d 602;

*Roberts v. Woven Wire Mattress Co.,* 46 Md. 374, 386; *Elder v. Warfield,* 7 H. & J. 391, 396; *Williston, Contracts* (Rev. ed.) § 142. There was no evidence of an agreement on Whitney's part to forego legal action; in fact he refused to make such an agreement, and actually filed suit within ninety days. There was no request for further deliveries nor were any made. It is difficult to find any benefit moving to the promisor or any detriment to the promisee. Cf. *Strohecker v. Schumacher & Seiler,* 185 Md. 144, 153, 43 A. 2d 208. Nevertheless, these later promises, like the earlier ones to pay outstanding balances, may have some evidentiary value as bearing upon the nature and extent of Weil's undertaking. Certainly the record does not show that down to the time of the trial he ever denied liability for the deliveries in excess of 200,000 gallons. We think the case was properly submitted to the jury.

*Judgments affirmed, with costs.*