**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DEUTSCHE CREDIT CORPORATION,
Plaintiff-Appellee,

v.

No. 95-2529

CHESAPEAKE YACHT SALES,
INCORPORATED; LEO J. MAURICIO;
DONNA C. MAURICIO,
Defendants-Appellants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-92-2377-WN)

Argued: April 3, 1996

Decided: August 12, 1996

Before MICHAEL and MOTZ, Circuit Judges,
and PHILLIPS, Senior Circuit Judge.

_____

Affirmed in part, reversed in part, and remanded by unpublished opinion. Senior Judge Phillips wrote the opinion, in which Judge Michael and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Alfred L. Scanlan, Jr., Colleen Ann Cavanaugh, SCAN-LAN & ROSEN, P.A., Baltimore, Maryland, for Appellants. Douglas Andrew Rubel, PROTAS & SPIVOK, CHARTERED, Bethesda,

Maryland, for Appellee. **ON BRIEF:** Sander Mednick, Annapolis, Maryland; Michael P. Darrow, HILLMAN, BROWN & DARROW, P.A., Annapolis, Maryland, for Appellants.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Deutsche Credit Corporation (Deutsche), as holder of two defaulted notes from Chesapeake Yacht Sales, Inc. (Chesapeake), sued Leo and Donna Mauricio, alleging that they are liable as guarantors of those notes. On cross-motions the district court granted summary judgment in favor of Deutsche. The Mauricios now appeal, contending that the court erred in holding 1) that they were liable as guarantors on the defaulted notes and 2) that Deutsche could recover interest on those notes at a rate of three percent above prime rather than two percent above prime. We affirm as to the Mauricios' liability on one note, reverse as to the other, and affirm on the question of the appropriate interest rate.

I.

Leo Mauricio is a part owner of Chesapeake, and, together with his wife Donna, owns the Maryland marina in which Chesapeake sells new and used yachts. In order to purchase yachts for resale, Chesapeake entered into a number of floor plan financing agreements with lenders. Transactions relating to two of these floor plans gave rise to this case.

First, in January of 1988, Chesapeake entered into a"Viking Six Month Floor Plan" with Centron Financial Services. Under this plan, Centron was to provide Chesapeake with financing to allow it to purchase new Viking yachts. Later that same month, the Mauricios

2

signed a "Guaranty" agreement, under which they guaranteed payment of all of Chesapeake's present and future debts to Centron.**1**

The next fall, Chesapeake entered into another floor-plan agreement with both Security Marine Creditcorp, Inc. (Security Marine) and Centron. Under Security Marine's "Six Month Floor Plan," Security Marine would finance Chesapeake's purchase of new Viking yachts, and Centron would serve as a "broker," performing various intermediary duties between Security Marine, Chesapeake, and Viking. In November of 1989, the Mauricios signed a second guaranty, this time in favor of Security Marine, in which they guaranteed payment of all of Chesapeake's present and future debts to that lender.**2**

In the summer of 1990, Chesapeake purchased two new yachts from Viking, one a sixty-three foot model, the other a seventy-two foot model. Security Marine financed the sixty-three foot yacht under its 1989 floor plan agreement, taking Chesapeake's note for the full purchase price. Centron apparently financed purchase of the seventy-two foot yacht, and simultaneously, on July 31, 1990, assigned to Deutsche "all of its rights, title and interest in the floor plan account of Chesapeake Yacht Sales," so that Deutsche was named as payee of

---

**1** The Centron guaranty read in relevant part:

> The undersigned . . . do hereby unconditionally Guarantee the prompt and punctual payment to you, your successors and assigns, of any and all present and future indebtedness, absolute or contingent of [Chesapeake] to you, and of all evidence of such indebtedness, and of any and all extensions and renewals thereof.

JA 36.

**2** The Security Marine guaranty read in relevant part:

> [W]e, the undersigned . . . agree to be, . . . jointly, severally and directly liable to you for the due performance of[Chesapeake's] Security Obligations both present and future, and any and all subsequent renewals, continuations, modifications, supplements and amendments thereof, and for the payment of any and all debts of [Chesapeake] of whatever nature, whether matured or unmatured, whether absolute or contingent and whether now or hereafter existing or arising . . . acquired by you by assignment, transfer or otherwise.

Chesapeake's note for this Yacht's purchase. JA 37. Then, on October 1, 1990, Security Marine assigned to Centron"all of [Security Marine's] rights, title and interest in the [sixty-three-foot yacht] Note of Chesapeake Yacht Sales, Inc." and Centron immediately again assigned to Deutsche "all its rights, title and interest in the wholesale floor plan account of Chesapeake Yacht Sales, Inc." JA 66.

Because Chesapeake had not yet sold the sixty-three foot yacht when the first payment on the note became due, it requested and Deutsche granted an extension of the financing period. Incident to this extension, the parties agreed to raise the interest rate from the face rate of two percent above prime to three percent above. JA 640.

In June of 1991, an interested buyer offered to trade in his used fifty-foot yacht--with cash boot--for the seventy-two foot yacht. All agreed to the deal. Deutsche then cancelled the seventy-two foot yacht note and financed Chesapeake's purchase of the trade-in yacht. At the end of the day, then, Chesapeake had the used fifty-foot yacht and Deutsche had Chesapeake's note for the purchase price of that yacht.

Chesapeake ultimately defaulted on the notes secured by the sixty-three and fifty-foot yachts. Deutsche then demanded that the Mauricios make good on their guarantees of Chesapeake's debts. When the Mauricios refused to pay, Deutsche repossessed and sold the two yachts, each sale resulting in a deficiency.

Deutsche then sued Chesapeake and the Mauricios as guarantors of Chesapeake's debts in the United States District Court for the District of Maryland, seeking to recover the deficiency on both notes, plus interest, costs, and attorneys' fees. Default judgment was entered against Chesapeake. On the remaining parties' cross-motions for summary judgments, the district court denied the Mauricios' motion and granted Deutsche's, holding that the Mauricios were liable as Chesapeake's guarantors for the deficiencies on both notes. Following a determination of damages, and entry of final judgment, the Mauricios took this appeal.

II.

The Mauricios first contend that the district court erred in holding them liable as a matter of law to Deutsche as guarantors of Chesa-

4

peake's obligations under the notes covering the sixty-three and fifty-foot yachts, and, accordingly, in granting Deutsche's summary judgment motion. While the Mauricios admit that they did execute two guaranties of Chesapeake's debts, they contend that no rights under those guaranties were assigned to Deutsche and that even if some rights were assigned, they did not apply to the two promissory notes in question.

Because the material facts are not in dispute this case may properly be resolved by summary judgment. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Reviewing the district court's judgment de novo, we agree with the district court that, as a matter of controlling Maryland substantive law, Deutsche is entitled to recover against the Mauricios for the deficiency on Chesapeake's debt under the defaulted note secured by the sixty-three foot yacht. We agree with the Mauricios, however, that they are not liable as guarantors for the deficiency on Chesapeake's note secured by the fifty-foot yacht.

A.

The district court correctly held that the Mauricios were liable as guarantors of the note secured by the sixty-three foot yacht. As earlier noted, in 1989 the Mauricios executed a guaranty to Security Marine that they would pay any future debts Chesapeake incurred to that lender. Accordingly, when, in July of 1990, Security Marine financed Chesapeake's purchase of the sixty-three foot yacht, the Mauricios, under the terms of their guaranty, became "jointly, severally and directly liable to [Security Marine]" for the payment of that debt. JA 197. And, because under Maryland law "[a]ssignment of a debt is held to operate as an assignment of a guaranty of the debt," Bachmann v. Glazer & Glazer, 559 A.2d 365, 370 (Md. 1989), Security Marine's assignment to Centron of the note secured by the sixty-three foot yacht note, and Centron's subsequent re-assignment of the note to Deutsche, transferred to Deutsche the original note holder's rights under the Mauricio's guaranty. In consequence, Deutsche was entitled to judgment against the Mauricios for the amount of the deficiency on the defaulted note so secured.

The Mauricios seek to avoid this conclusion by contending that this guaranty was not intended to apply to loans, such as that secured by

5

this note, that were made under Security Marine's 1989 floor plan agreement. But the guaranty flatly provides otherwise; by its terms it plainly applies to <u>all</u> of Chesapeake's future debts to Security Marine, not just to particular types of debts under particular contracts.

The Mauricios were therefore properly held liable as guarantors for the deficiency on the note secured by the sixty-three foot yacht.

B.

The district court erred, however, in concluding that as a matter of law, the Mauricios were liable to Deutsche as guarantors of the defaulted note secured by the fifty-foot yacht. We hold, to the contrary, that, under Maryland law, Deutsche had no guaranty rights against the Mauricios with respect to loans that <u>Deutsche itself</u> made to Chesapeake.

Such rights could only have arisen in Deutsche from a direct guaranty made by the Mauricios to Deutsche, or by assignment from someone to whom a guaranty had been made that was legally assignable. There is no claim of a direct guaranty to Deutsche, so any rights it had could only have arisen from a legally valid assignment by Centron or Security Marine of the Mauricios' guaranties to them. The district court concluded that such rights had been validly assigned. We disagree. Under Maryland law, neither of the assignments made by Centron to Deutsche in respect of Chesapeake's indebtednesses was effective to assign any guaranty rights against the Mauricios respecting the note secured by the fifty-foot yacht.

Whether a particular assignment is effective to assign a guaranty respecting a particular debt depends on two things: (1) whether the assignment in terms covers the guaranty, and (2) whether the guaranty is a legally assignable one. Deutsche relies on two assignments as the source of its right to recover from the Mauricios as guarantors of the note securing the fifty-foot yacht: (1) Centron's July 31, 1990 assignment to Deutsche and (2) Centron's October 1, 1990 assignment to Deutsche simultaneously with Security Marine's assignment to Centron, of their respective "rights, titles, and interests" in Chesapeake's indebtednesses.

6

1.

Looking first to Centron's July 31, 1990 assignment, we conclude that, even if it could be interpreted as intended to include the Mauricio guaranty to Centron, the guaranty was not legally assignable. While, as indicated in Part II.A., an assignment of debt carries with it an assignment of any guaranty of that debt, this does not mean that a guaranty may be assigned independently of any underlying debt. The general rule is, in fact, to the contrary where the guaranty is "special," i.e., made only to particular potential lender or lenders. As expressed in black-letter form:

> [I]f a guaranty covers future credit which is to be extended by a specific individual, it may not be transferred to another person so as to enable him to become the creditor who is secured by the guaranty.

38 Am. Jur. 2d Guaranty § 35.**3**

The Centron guaranty is such an instrument. It specifies that it is made "to induce . . . Centron Financial Services, Inc. to make loans and in consideration of loans heretofore and hereafter made by [Centron] to Chesapeake." JA 36. Further, it promises "prompt and punctual payment . . . of any and all present and future indebtedness . . . of [Chesapeake] to you," i.e. Centron. Id. (emphasis added). The guaranty does contemplate that once Centron extended credit to Chesapeake, Centron might assign the debt, for the guaranty was for payment to Centron, "its successors and assigns." Id. The guaranty nowhere includes, however, a promise to pay debts arising between Chesapeake and anyone other than Centron. Under the general rule, therefore, the Centron guaranty, covering only credit extended by

_____

**3** As a corollary to the general rule that special guaranties are not assignable, it is commonly said that "general" guaranties--guaranties made to anyone who extends credit to a particular entity--are assignable. 38 Am. Jur. 2d Guaranty § 35 (1968). This is of course anomalous: By its terms a general guaranty needs no assignment to be available to anyone. See id. (noting the anomaly, but reciting the convention).

Centron, could not be assigned by Centron so as to enable Deutsche to become a creditor secured by the guaranty.**4**

We are satisfied that Maryland courts would so hold, though on a basis more explanatory of the actual reason for non-assignability of guaranties independently of consummated debt. Maryland law properly treats guaranties of future debt as simply a species of "continuing" or "standing" offers to make a series of individual, unilateral contracts. See Weil v. Free State Oil Co., 87 A.2d 826, 830 (Md. 1956). Under general contract law principles, such offers are accepted by the extension of credit by the offeree. See id. ("to be accepted from time to time by [credit extension]"). See generally Restatement (Second) of Contracts § 31, cmt. b (1981) ("continuing guaranty" constitutes a "standard example of a divisible offer to make a series of contracts"). And, until such a continuing offer is accepted, it remains only an offer of contract which, as with contract offers in general, is not assignable. See Routzahn v. Cromer, 150 A.2d 912, 915 (Md. 1959) ("an offer made to one person cannot be accepted by another"); Restatement (Second) of Contracts § 52 ("an offer can be accepted only by a person whom it invites to furnish consideration"); 38 Am. Jur. 2d Guaranty § 35 ("offer of guaranty is, in and of itself, not assignable").

_____

**4** There are exceptions to the general non-assignability rule that are recognized in some jurisdictions. See, e.g. , Essex Int'l Inc. v. Clamage, 440 F.2d 547, 550 (7th Cir. 1971) (under Illinois law, assignment effective unless it causes "material change" in debtor-creditor-guarantor relationship); Kraft Foodservice, Inc. v. Hardee, 457 S.E.2d 596, 598 (N.C. 1995) (assignable unless inconsistent with statute or public policy, or unless executed in reliance on personal confidence in original creditor); Sinclair Marketing, Inc. v. Siepert, 695 P.2d 385, 389 (Idaho 1985) (fact question dependent upon parties' intent).

While broad language of these decisions implies a rule of general application, each actually involved assignments incident to corporate asset sales or contract exchanges between related corporations. Each therefore rests, at least in part, on a concern that guarantors should not be released when a creditor merely changes its name or corporate form. E.g. Essex, 440 F.2d at 550. The assignments here are by contrast between unrelated entities and not incident to corporate asset sales. The "mere change in name or form" concern is not, therefore, present here even were Maryland law accepting of these exceptions.

8

Accordingly, under Maryland law, as generally, Centron's July 31, 1990 assignment to Deutsche of all its "rights, title and interests" in Chesapeake's indebtedness was ineffective to assign to Deutsche any power to bind the Mauricios as guarantors of any future debts of Chesapeake to Deutsche.

2.

The only other possible source of a guaranty right in respect of Chesapeake's debt to Deutsche for the latter's financing of the fifty-foot yacht, is Centron's October 1, 1990 assignment to Deutsche of "all its rights, title and interest in the wholesale floor plan account of Chesapeake Yacht Sales." JA 66. This assignment was ineffective to create any power in Deutsche to bind the Mauricios as guarantors of any future debts arising from Deutsche's own extension of credit to Chesapeake for the same reason discussed in Part II.B.1. The Mauricios' standing offer of guaranty to Centron was not assignable to Deutsche to create any power of acceptance.

Nor could Security Marine's contemporaneous assignment to Centron have somehow altered this conclusion. That assignment, by its terms, only purported to assign to Centron "all of [Security Marine's] rights, title and interest in the Note [that securing the sixty-three foot yacht loan] of Chesapeake Yacht Sales, Inc." JA 67. This of course had nothing to do with the fifty-foot yacht debt.

For these reasons, Deutsche was not, as a matter of law, entitled to recover the deficiency on the fifty-foot yacht indebtedness from the Mauricios as guarantors. The district court's summary judgment for Deutsche as to that debt deficiency must therefore be reversed.

III.

The Mauricios challenge the district court's ruling, adopting the magistrate judge's recommendation, that Deutsche was entitled to recover interest at the rate of three percent above prime rather than two percent as originally provided. We affirm that ruling as it applies to the deficiency on the sixty-three foot yacht note.

9

Although the note in issue originally specified a rate of two percent over prime, the magistrate judge found that, after Chesapeake defaulted on that note, it had agreed with Deutsche that interest would thereafter be due at three percent over prime. The Mauricios now argue that, if such an agreement was made, it amounted to a change in the terms of that note, which, in turn, would release them from their obligation as guarantors of the note. See Art Plate Glass & Mirror Corp. v. Fidelity Construc. Corp., 69 A.2d 808 (Md. 1949) (guarantor may not, without his consent, be bound beyond original terms of contract). We disagree.

The language of the Mauricio's guaranty to Security Marine-- which applies to the note in question--defeats this argument. In the Security Marine guaranty, the Mauricios agreed to pay not only all of Chesapeake's debts to Security Marine, but also "any and all subsequent renewals, continuations, modifications, supplements, and amendments thereof." J.A. 197 (emphasis added). Because the Mauricios agreed from the beginning to guarantee repayment of any of Chesapeake's debts to Security Marine or any modification of those debts--like the change in interest rate here--they cannot now argue that such a modification was a change in the underlying debt that released them from liability. See Greenwell v. American Guar. Corp., 277 A.2d 70, 74 (Md. 1971) (where guarantee itself allows for changes in principal agreement, such changes do not release guarantor from liability). Accordingly, we reject the Mauricios' challenge to the interest rate applicable to the debt due under the note on the sixty-three foot yacht.

IV.

For reasons given, we reverse that portion of the district court's judgment holding the Mauricios liable as guarantors of the note financing the fifty-foot yacht; affirm that portion holding the Mauricios liable as guarantors of Chesapeake's obligations under the note financing the sixty-three foot yacht; and affirm the district court's ruling that interest on the amount recoverable as debt deficiency is computable at three percent above prime. The action is remanded for entry of a judgment in accordance with this opinion.

SO ORDERED

10